UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

B & M Linen, Corp,

2008 CV 10093 (RJH/MHD)

       Plaintiff,

     -against-

COMPLAINT

Trial by Jury Demanded

Kannegiesser USA, Corp,
Michael H. Dreher , Martin Kannegiesser
and Herbert Kannegiesser GmbH & Co,.

       Defendants.

---------------------------------------------------------------x

     Plaintiff B & M Linen Corp., by its attorney, Marina Tylo, files this Complaint and Jury

Demand against Kannegiesser, USA, Corp., Michael H. Dreher,  Dipl.-Kfm.Martin Kannegiesser

and Herbert Kannegiesser GmbH & Co.. on personal knowledge  as to all facts regarding itself,

and on information and belief as to all others, as follows:

## I.
## PRELIMINARY STATEMENT

1.     These claims arise out of Defendants' repeated misrepresentations to Plaintiff,

and their gross misconduct with respect to the inducement, performance, and ultimately, the

breach of certain agreements and warranties between the parties pertaining to the equipment and

machinery specially designed, manufactured, installed and services for the Plaintiff's industrial

size laundry facility. Plaintiff seeks compensatory and punitive damages arising from

Defendants' wrongful conduct stemming from inter alia, fraudulent inducement, gross

misrepresentation, delay and failure to act upon agreed upon terms, breach of warranties,

economic duress and gross negligence .

## II.
## PARTIES

### A. Plaintiff

2.     Plaintiff B & M Linen, Corp., is a New York corporation with its principal place of

business located in Bronx, New York, hereinafter, "B&M".

### B. Defendants

3.      Upon information and belief, Defendant Dipl.-Kfm. Martin. Kannegiesser,

hereinafter, "Mr. K" is a resident of Germany. Mr. K, personally and through entities, conducts

significant business in New York; owns substantial real estate and other interests in New York,

derives income and revenues from activities and contacts in New York; transacts business with

New York residents; and alone and in combination with others, has committed one or more torts,

in whole or in part, in the State of New York. Upon information and belief, at all relevant time,

from 2001 till present, Mr. K was and is the managing partner and executive officer of Herbert

Kannegiesser GmbH & Co.

4.    Defendant Kannegiesser USA , Corp. ("K-USA") is a Texas corporation with its principal place of business located in Grand Prairie, Texas.. Defendant K-USA is controlled by Kannegiesser, Germany and Mr. K. K-USA derives significant revenues and income from activities and contacts in New York; transacts business with New York residents; and alone and in combination with others, has committed one or more torts, in whole or in part, in the State of New York.

5.    Upon information and belief, Defendant Herbert Kannegiesser GmbH & Co. ("K-Germany") is a German corporation. K-Germany derives significant revenues and income from activities and contacts in New York; transacts business with New York residents; and alone and in combination with others, has committed one or more torts, in whole or in part, in the State of New York.

6.    Defendant Michael H. Dreher ("Mr. D."), is the President of Kannegiesser USA, Co. and upon information and belief, a resident of the state of Texas. Mr. D has made oral and written representations to B&M that he would be personally responsible for B&M's account and 'would make things right" if they were ever wrong.

### III.

### JURISDICTION AND VENUE

7.    This Court has jurisdiction over these claims pursuant to 28 U.S.C. # 1331 and

1332(a)(1), because the amount in controversy exceeds the sum of $100,000, exclusive of interests and costs, and because the matter is between citizens of different states.

8.     This Court has personal jurisdiction over  Mr. K. pursuant to New York CPLR Section 301 and/or 302 because inter alia , Mr. K. transacts and has transacted business within the State of New York and has committed tortious acts within the State of New York and/or committed tortious acts outside the state causing injury to persons and property within the state, and/or contracted to supply services in the state, through one more persons or agents.

9.     This Court has personal jurisdiction over K-USA pursuant to New York CPLR Section 301 and/or 302 because inter alia , K-USA. transacts and has transacted business within the State of New York and has committed tortious acts within the State of New York and/or committed tortious acts outside the state causing injury to persons and property within the state and/or contracted to supply services in the state, through one more persons or agents.

10.     This Court has personal jurisdiction over  Mr. D. pursuant to New York CPLR Section 301 and/or 302 because inter alia , Mr. D transacts and has transacted business within the State of New York and has committed tortious acts within the State of New York and/or committed tortious acts outside the state causing injury to persons and property within the state, and/or contracted to supply services in the state, through one more persons or agents.

11.     This Court has personal jurisdiction over K-Germany pursuant to CPLR Section

301 and 302 because, among other things, defendant K-Germany transacts and has transacted business within the State of New York and has committed tortious acts within the State of New York and/or committed tortious acts outside the state causing injury to persons and property within the state and/or contracted to supply services in the state, through one more persons or agents.

12. Venue is proper in this Court pursuant to 28 U.S.C. # 1391(a) - (d), because a substantial part of the events and omissions giving raise to the claims asserted herein occurred in this District.

## IV.
## FACTUAL BACKGROUND

### A. PLAINTIFF SUCCESSFULLY LAUNCHES Laundry Servicing Facility.

13. In 1992 Miron Markus, the President of B & M Linen Corp. launched his business B & M Linen Corp. ("B&M"). B&M was to operate a laundry service outfit whereby hospitality industry clientele would place an order, have their linens picked-up, brought to the service facility, cleaned, pressed and folded and dropped off back with the client. At the time of its inception, B&M was designed and operated with intend to attract first tier hotel clientele as their client whose patrons included the rich and famous and top business executives.

14. From 1992 to 2006, B&M operated out of 310 Walton Avenue, Bronx, NY 10451 location. From 2006 till present, B&M is operating out of the facility located at 220

Coster Street, Bronx NY 10474. The gigantic facility is in part run like a conveyor line. On a constantly moving line, dirty linens, mostly made of the finest fabric in the world, get sorted, then loaded onto the conveyor, then washed, then rinsed, then wrung out, then pressed, and finally folded. Most of the equipment which constitutes a part and parcel of that conveyor line is interlocked and operated by a central specially designed computer soft ware. If a tiny part of any of those machines malfunctions, all system comes to a halt, with quite severe consequences, ranging from destroyed linens, to destroying other parts of equipment, to tremendous down time, when most of the plant gets shut down.

15.     At the heart of the plant is mostly the equipment and parts designed and produced by K-Germany and sold by K-USA, hereinafter, the "Equipment". Attached hereto as Exhibit **A** are copies of invoices for certain larger pieces of the equipment and parts.

16.     The relationship between the parties started some time in Spring and early Summer  2001 when during a hospitality industry trade convention, a representative of B&M picked up a  number of brochures from K-USA's  booth, tooting their products, quality of their equipment,  top hands on customer service, extensive warranties on equipment and parts.

17.     During the same convention, the company representative picked up a number of other brochures, from other companies, specializing in the same field. K-USA's  prices were not lower then those of their competitors; in most instances they were slightly higher. Neither was K-

USA the oldest or the largest in its field. Far from it. Some time after the convention, Mr. Markus had a chance to talk "shop" with chief representatives of a number of such companies, K-USA being one of them. Upon information and belief, in Summer of 2001, Mr. Dreher, a CEO of K-USA personally came to B&M's facility for an all day presentation session. B&M's needs were discussed. K-Germany's products were discussed at lengths, including method and means of manufacture, quality of product, design and service components. It was made very clear to Mr. Markus that a very special and close relationship existed between K-USA and K-Germany, which was not just a mere distributorship relationship where K-USA places an order with Germany-K for equipment manufactured by Germany-K which then gets installed by personnel working for K-USA. The relationship between the two companies, as stated, went beyond a principal and its agent and was quite fiduciary in its nature. K-USA as was represented in that meeting, was and is in fact, as it turned out, an integral part and parcel of the Kannegiesser family of companies. Separate corporate names thinly veiling the reality of the situation. The President of B&M needed more information and further assurances, so he personally traveled to Germany to look at the manufacturing of the equipment at the Kannegiesser plant; at the same time he looked at the plant and the equipment manufactured by a company called Sinking.

After that trip B&M top executive personnel had an internal meeting where such issues

as pricing, reliability of equipment, (as warranted by both Mr. D. and the staff at K-Germany that took Mr. Markus around their plant, and the staff of K-USA) were discussed at length. The pricing was consistent between the two bids and finally the bid was awarded to K-USA based on the warranties repeated over and over.

18.    From mid 2001 to early 2005, when B&M operated out of 310 Walton, Bronx, N.Y. facility, Plaintiff has ordered, certain equipment from the Defendants, totaling in excess of $ 500,000.00. During that period in time, as is subsequently, the equipment was mostly manufactured by K-Germany and sold to B&M by K-USA.

19.    At first, matters between the parties were proceeding more or less smoothly. Mistakes were made on part of Defendants but at first, and very intentionally so, Defendants acted much fasted and more attentively on ridding the equipment of mistakes and kinks then they did so subsequently, when after a while more and more of B&M's facility was run exclusively on and operated by Kannegiesser equipment, software and products. Plaintiff realized after a while that a part and parcel of the Defendant's scheme, was increased reliance by Plaintiff on Kannegiesser products and services. Defendants' plan was quite ingenious: after a number of huge, specially designed Kannegiesser aggregates were installed, (each costing millions of dollars and taking months of planning, installation, start up, and the ensuing forced down time for such times as when the equipment failed to work due to a faulty design or manufacture or a

malfunctioning part) it could usually be only be substituted by a Kannegiesser machine, equipment or a part thereof, with parts, labor and service purchased from Kannegiesser, at the pace convenient for Kannegiesser and at prices dictated by Kannegiesser.

20.    In 2004, B&M decided to move to new location. In late 2004, B&M's vice president traveled to K-Germany's plant in Vlotho, Germany. The company wanted to upgrade their equipment, making the new plant even more competitive then their previous facility, primed to offer top shelf service to their top shelf clientele. Among B&M's clients were such top tier hospitality giants as Mandarin Oriental Hotel, Le Parker Meridian, Roosevelt Hotel, Inter-Continental Hotel, Bryant Park Hotel, Hilton Fort Lee, Paramount Hotel, The Warwick, The Shoreham, The Muse, The Bentley, Jolly Madison Hotel, The Algonquin, Mansfield Hotel, and etc.

21.    During the visit to the German plant, the top brass of K-Germany personally assured the vice-president that K-Germany will re-double their efforts to design, manufacture and implement specialty items for B&M and have a stronger reign on K-USA with respect to their practices vis-avis B&M.

22.    In reliance on their assurances and promises, B&M placed a large order with the Defendants for their new plant. In 2005, before moving into their new permanent location, B&M, after months of discussions with the Defendants about specifics for the new upgraded equipment,

B&M placed an order including the following pieces of equipment: 1 Loading Conveyor for, Batch Washer, Press for water extraction, 2 Storage Conveyors for storing linen till the shuttles become free, 2 Shuttles which bring the linen from the presses to dryers or by-pass conveyor, 5 Dryers which dryer or condition linen, 2 HPM Grand Ironers for ironing flatwork (sheets, pillowcases, table cloths, Napkins, etc) , 3 HPM-12 2 roll Ironers for ironing flatwork (sheets, pillowcases, table cloths, Napkins, etc) , 1 CFM Sheet Folder or folding Sheets, I ETM Sheet Feeder for feeding sheets into an Ironer, 1 AFM Towel Folder for folding towels this equipment was priced at nearly $2M including the relocation of the existing Kannegiesser equipment which was purchased over the past 4-5 years from Walton Ave to Coster Street, Bronx, New York, exceeding $500,000.00 . Attached hereto as Exhibit **B** is a copy of the agreement reached between the parties pertaining to certain equipment purchased by Plaintiff with specific intent to be installed into the new location; the order covered equipment, set up, installation, calibration and start up service. Additional pieces were added on to the order at a latter date. Equipment was manufactured by K-Germany and sold by K-USA. Service  personnel for start up and tune ups, at various points in time,  came from both USA and Germany.

23.     Defendants were made fully aware of the time table for the testing, design, manufacture and installation of the new order. It was made very clear that until plaintiff's new plant is ready the equipment can not be installed.  E-mails were flying back and forth between

New York, Texas and Germany. The order was so extensive that special financing was needed to be obtained on part of B&M.

24.     Problems with the order appeared gradually and grew alarmingly.

25.     Certain equipment was defective as to the design, while other failed to work either due to a manufacturing error, a design error or improper calibration. Agreed upon time lines were not kept by Defendants. Plaintiff lost money and clientele. Correspondence via e-mails and phone calls was flying back and forth to no avail.

26.     Defendants refused to take back their equipment and refund the funds. Plaintiff was stuck with expensive equipment which was even less then ill fitted for the intended use, led to numerous and frequent break downs in the plaintiff's plant's operations and loss of money and clientele.

27.     Subsequent to B&M's move to a new location in the Bronx in mid 2006, in further reliance on the Defendants assurances and promises, even more equipment was purchased from the Defendants. In order to coordinate the newer Equipment, save time, and improve plant efficiency, Plaintiff ordered a specially designed soft-ware package from the Defendants. The package came highly tooted by the Defendants. Till this date, that software has presented serious and ongoing problems to Plaintiff by constantly malfunctioning or failing to

work altogether. In addition to the malfunctioning Equipment, the ill suited software

jeopardizing any chances for the Plaintiff to smoothly run its plant. Plaintiff's repeated demands

to address the issue were and still are by and large met with silence.

**V.**

**COUNTS**

**A.      COUNT ONE - BREACH OF PURCHASE AGREEMENTS**

27.      B&M repeats and realleges paragraph 1 through 27 hereof as

though set forth fully herein.

28.      Defendants' acts and omissions described above, as well as the acts

and omissions of Defendants' agents, servants and employees, constitute material

breaches of the inter alia, following Purchase Agreements ("PAs") between the parties:

(I) PA dated 2/19/07 a true copy of which is annexed hereto as Exhibit "C";

(II) PA dated 12/1/04 a true copy of which is annexed hereto as Exhibit "D"; the

equipment per that PA was installed, as contemplated by the parties, on or about the later

part of 2006.

29.   Those breaches include, but are not limited to, failure to properly design, test,

manufacture and produce each piece of equipment per exact specifications within the agreements; failure to provide the requisite start-up and commissioning on the agreed upon terms for the operation of equipment so as to preclude any malfunctions, delays, loss of operations and service, Defendants' failure to timely address an overwhelming number of problems with the equipment as specified in the PAs in spite of B&M's continuous and relentless attempts to bring such problems to Defendants' attention for resolution; Defendants' failure to set up and conduct timely test for possibility of synchronizing the Equipment as called for in the Pas and by the industry standards), Defendants' refusal to utilize B&M's research data or take account and make use of B&M's knowledgeable advice in its areas of expertise.

30.    B&M duly performed all of the conditions of the PA on its part despite Defendants' wrongful acts and omissions.

31.    Defendants, without just cause, breached the PA. Defendants' material breach of the PA, has caused B&M to sustained economic and other injuries, for which B&M seeks compensation in the form of monetary damages in an amount to be determined by the jury at trial.

**B.    COUNT TWO – BREACH OF WARRANTY BY K-USA**

32.    B&M hereby realleges and incorporates the allegations set forth in

paragraphs 1 through 32, above.

33.    Certain purchase agreements between Plaintiff and Defendant K-USA contained written warranties with respect to parts, certain purchase agreements contained written warranties with respect to material and workmanship, and for parts and labor, (but only for the equipment or parts manufactured by K-USA, not K-Germany, or other manufacturers, while other agreements contained no written warranties by intent of the parties to have the pertinent provisions of the Uniform Commercial Code cover the transaction, especially on super large orders covering behemoth sized equipment, intended to outlast the next ice age .

34.    Equipment and parts sold to Plaintiff by K-USA was, upon information and belief, not manufactured by K-USA. Upon information, K-USA does not have a manufacturing plant. K-Germany and other manufacturers manufacture equipment and parts for end users. K-USA routinely adorns equipment and parts sold to end users with Kannegiesser logo. Attached hereto as Exhibit E is a copy of K-USA's warranty. This warranty did not accompany all purchase orders, especially till 2007. PA dated 12/1/2004 did not contain any warranties; neither did it limit their existence by any language contained therein.

35.    Failure by Defendant K-USA to address the issue of warranty with respect

to goods and services sold by it to Plaintiff does not relieve Defendant K_USA from its obligations with respect to the warranties as warranted by the Uniform Commercial Code.

36.    Furthermore, Defendant K-USA breached warranties in PA agreement dated 2/19/07 by stating, representing and warranting that skilled labor will be send over by K-USA to Plaintiff's plant to install certain equipment.

37.    Defendant K-USA breached the aforementioned warranties. Defendant K-USA's agents and employees repeatedly stated to Plaintiff's owner and employees that most of the "skilled labor" Defendant K-USA employed and send out to various customer's plants, including that of Plaintiff were in fact not skilled in installation and start up of newly installed equipment and parts. Laborers employed by K-USA who were send over to install equipment ordered by Plaintiff by purchase order dated 2/7/07 failed to complete installation at the plant, leaving equipment uninstalled and plant none functional.

38.    Defendant K-USA's breach of its warranties, express and implied, to B&M has caused B&M to suffer economic and other injuries, for which B&M seeks compensation in the amount of monetary damages in an amount to be determined by the jury at trial.

## COUNT THREE- BREACH OF WARRANTY BY K-GERMANY

39.    B&M hereby realleges and incorporates the allegations set forth in Paragraph 1 through 39 , above.

40.    By virtue of being the designer and manufacturer of most equipment and parts purchased by Plaintiff from Defendants, K-Germany owed Plaintiff various warranties on the products, ranging from warranty of merchantability as specifically designed and manufactured and sold for specific use, to equipment and parts being free from defects in material and workmanship, K-Germany was under responsibility to Plaintiff as a warrantor.

41.    Defendant K-Germany's breach of its warranties for equipment and parts sold to Plaintiff which were designed, manufactured, serviced, repaired and updated by K-Germany for Plaintiff to B&M and for benefit of B&M has caused B&M to suffer economic and other injuries, for which B&M seeks compensation in the amount of monetary damages in an amount to be determined by the jury at trial.

## C. COUNT FOUR -- BREACH OF FIDUCIARY DUTY BY ALL DEFENDANTS

42.    B&M hereby realleges and incorporates the allegations set forth in Paragraph 1 through 42, above.

43.    By virtue of rights and obligations created by and set forth in the Purchase Agreements, a fiduciary relationship was created and continued to exist between B&M and Bauer. The rights and obligations were in way standard and ordinary in a routine business setting of an arms length type of a transaction between some buyer and a seller.

44.    All washing equipment and all drying equipment at the Plaintiff's plant was specially designed for Plaintiff by Defendants K USA and K-GERMANY , which was then specially programmed by said Defendants, as far as software, for Plaintiffs' exclusive needs, which was then specially installed by the Defendants' personnel into the Plaintiffs plant.

45.    The Defendants' were fully aware of the above stated, including Mr. K and Mr. D, and all the way down to the lowly service personnel. The Defendants were also fully aware that the over all existence and economic livelihood of the Plaintiff's plant depended on the Kannegiesser's equipment. If any part of the equipment fails to work properly, the Plaintiff's plant basically comes to a halt.

46.    As early as 2001, when Mr. M went to Germany's Kannegiesser plant to take a first hand look at how their equipment was designed, tested and manufactured, and then when he sat down with the top brass of the plant to talk shop, prices, timing, delivery and service issues, all the players were fully aware that the life line of the entire B&M plant

would be held in Kannegiesser's hands.

47.     The fiduciary duties owed by Defendants to B&M included, by virtue of the above, without limitation, the duties of good faith and fair dealing, honesty, and full disclosure. In addition, the fiduciary relationship between the parties carried with it an attendant obligation on the part of Defendants not to engage in self dealing and not to promote its self-interests at the expense and to the detriment B&M.

48.     Defendants breached its fiduciary duties to B&M by engaging in the acts and conduct described above.

49.     As the result of Defendants' breach of fiduciary duty B&M has sustained economic and other injuries, for which B&M seeks compensation in the form of monetary damages in an amount to be determined by the jury at trial.

## COUNT FIVE-- RESTITUTION AND REIMBURSEMENT FOR FREIGHT, WRONGLY DESIGNED EQUIPMENT, DEFECTIVE AND DAMAGED PARTS AND MONEY PAID FOR FREIGHT, SERVICE, SLOW DOWNS AND OVERTIME AGAINST DEFENDANTS K-USA, K-GERMANY AND MR.D ,

50.     B&M hereby realleges and incorporates the allegations set forth in Paragraph 1 through 50, above.

51.     Since 2001, till shortly before filling on the instant suit, on numerous occasions, the K-USA delivered to Plaintiff parts which were not new, as promised and

warranted, parts which were defective, and parts which were damaged. For each of the above, on such occasions as K-USA agreed to repair or replace the items, Plaintiff had to pay for freight on the items, for cost of service on the items, and for over time of its own employees when equipment was not functioning. Additionally, clientele and contracts was lost.

52.     Defendant retained benefits for which B&M must be reimbursed including moneys expended by Plaintiff to cover on sight visits by service and installation and upgrade personnel working for Defendants on equipment and parts which malfunctioned, broke or were wrongly installed and designed.

53.     Additionally, as part and parcel of special order PA dated 12/04 which was finally set up by K-USA some time in late winter of 2006, a certain equipment called CFM was ordered by Plaintiff for a left arm installation but was designed, manufactured, shipped and installed by Defendants K-Germany and then K USA as the opposite hand discharge usage. The Plaintiff's plant was not designed or set up for equipment for right arm discharge usage. Countless hours were wasted in attempts to install and re install the machine; income which would have been generated during normal business hours was lost. Over time was paid. Clientele was left dissatisfied. Finally, after wasting man hours, time and money, CFM was converted to the proper side usage.

54.    Accordingly, B&M seeks an order of restitution directing defendants to reimburse and pay to B&M as restitution the amounts lost as stated above

## COUNT SIX - BREACH OF IMPLIED DUTIES OF GOOD FAITH AND FAIR DEALING BY DEFENDANT K-USA

55.    B&M hereby realleges and incorporates the allegations set forth in Paragraphs 1 through 55, above.

56.    By virtue of the contractual and fiduciary relationship between Defendant K-USA and B&M, defendants owed B&M an implied duty of good faith and fair dealing.

57.    Defendant have breached its implied duties of good faith and fair dealing.

58.    Defendants breached its implied duties of good faith an fair dealing to B&M through the acts and conduct described above.

59.    As the result of Defendants' breaches of its implied duties of good faith and fair dealing, B&M has sustained injury for which he seeks monetary damages in an amount to be determined by the jury at trial.

60.    In addition, because Defendant's breaches of their duties of good faith and fair dealing were committed knowingly, intentionally, and recklessly, B&M seeks to recover punitive damages in an additional amount to be determined by the jury at trial.

## COUNT SEVEN - BREACH OF IMPLIED DUTIES OF GOOD FAITH AND FAIR DEALING BY DEFENDANT K-GERMANY

61. B&M hereby realleges and incorporates the allegations set forth in Paragraphs 1 through 61 above.

62. By virtue of the fiduciary relationship between Defendant K-GERMANY and B&M, defendants owed B&M an implied duty of good faith and fair dealing.

63. Defendants have breached its implied duties of good faith and fair dealing.

64. Defendants breached its implied duties of good faith an fair dealing to B&M through the acts and conduct described above.

65. As the result of Defendants' breaches of its implied duties of good faith and fair dealing, B&M has sustained injury for which he seeks monetary damages in an amount to be determined by the jury at trial.

66. In addition, because Defendants' breaches of their duties of good faith and fair dealing were committed knowingly, intentionally, and recklessly, B&M seeks to recover punitive damages in an additional amount to be determined by the jury at trial.

## COUNT EIGHT - FRAUD , FRAUD IN THE INDUCEMENT , CONCEALMENT AND DECEIT BY ALL DEFENDANTS

67. B&M hereby realleges and incorporates the allegations set forth in Paragraph 1

through 67 above.

68.     As set forth above, all throughout the negotiations leading to the first multi million dollar order placed by B&M with Kannegiesser- USA, and continuously up to and including the filling of this suit, K-USA, its President, its key officers Mr. D and Phil Hart, knowingly, willfully and intentionally with clear and unequivocal intent to induce and deceive, imparted information on the Plaintiff which was not true, was not intended to be true and did not turn out to be true. Additionally, information which was pivotal to smooth running of the plant and its equipment was not imparted to Plaintiff and caused damage to equipment, loss of time, income and opportunity. Possible issues with safety in operation of equipment, which should have been brought to Plaintiff's attention, were not.

69.     Each of the above referenced stated in the affirmative that Kannegiesser's products are of top design and quality, each of which had been tested extensively before being released to the clients per order, that each company stands behind its products and will address any and all issues immediately as issues with equipment, parts and service arise. Each informed the Plaintiff that their service personnel would be available 24./ 7 being fully aware that plants are open about 18 hours a day, 365 days a year

70.     Kennigeisser manuals for their equipment and parts routinely contain information on anticipated defect free hours of operation during which the equipment is not anticipated to be in need of repair, replacement or maintenance. Information contained in manuals frequently exaggerated true durability of equipment and parts. Additionally, manuals for certain equipment, like for an ironer model number HPM 12, show diagrams and offer ways to fix problems or repair components. Plaintiff's equipment which carriers the same model number has different components and working parts then the one shown on the diagram of the manual. This taken in conjunction with the fact that Kennigeiser's service and repair personnel take very long to respond to the Plaintiff's requests for repair or service, making Plaintiff unable to address the problems with parts and equipment on their own, since manuals are of little help.

71.     A significant component with plaintiff selecting Kennigeisser to outfit their plant was a promise by Mr. K and Mr. D, respective presidents, that they will fix all problems ASAP, with as little work time down as possible.

72.     In a memo dated July 23, 2003, Michel H. Dreher, the President of K-USA wrote the following to Plaintiff's president: " When you awarded the purchase order of your two tunnels to Kannegiesser-USA in year 2001, I assured you that I personally would be responsible for your account, and that we would "make things right" if they were ever wrong." The statement was intended to further induce Plaintiff's President to rely on

Defendants' good faith and strong backing. In years that followed, leading up to the instant suit, instead the following would happen more and more often:

(a)     In late Spring 2008, when two out of three Kannegiesser 's tunnels responsible for washing 99.9% of plaintiff's linen broke down and placed the plant at a virtual stand still, Plaintiff contacted K-USA. Ms. Jannice Zimmerman, a customer service coordinator, per Kannegiesser.de/contact web site, a K-GERMANY directory of names and personnel forking for them, spoke to Plaintiff's management and in no uncertain terms informed them that at that time, no over the phone or in person support was available for Plaintiff. Nearly two days later, a service person finally contacted Plaintiff back . A third party informed Plaintiff's Vice President that during the time in question, a large team of K-USA's service and repair personnel were at his plant about 50 miles away from that of Plaintiff's, installing new expensive equipment. Eve after two or so days when a service man came onto the plant to examine the two tunnels, he left fast, informing the plant's manager that he "could not ascertain the problem". The plant experienced tremendous down time, hours of overtime and dissatisfied customers threatening to leave and loss of good reputation;

(b)     Plaintiff's President, Vice President and the plant manager were informed by Defendants' key executive personnel,  that the Defendants provide 24/7 service

support. Plaintiff's key personnel were all given cell phone numbers to Defendan't key personnelle, but not to Mr. K, to be used when necessary. In the past 6 months, ever since Plaintiff elected not to purchase certain costly equipment form the Defendants due to myriad of problems Plaintiff faced as result of Defendants acts and inactions, most of Plaintiff's calls to Defendant's employee and agents went un-answered or returned with much delay during business hours and after hours. None of Plaintiff's calls were social in nature. Upon solid information, during the same hours calls placed to K-USA by other k-USA's customers were immediately answered and matters were immediately addressed.

(c )   Within the past half a year, new equipment and parts purchased from Defendant K-USA which was in need of repair and was under warranty was refused to be repaired or serviced. Due to the break down of some parts of Kannegiesser's equipment, other pars became damaged and in need of repair, causing a cascading effect of break downs set backs, delays and losses. .

(d)   On at least 25 occasions a serious repair, replacement oe maintenance was needed on six brand new ironers which were installed by K-USA in 2006; the ironers were specially designed for the Plaintiff 's plant by K-GERMANY. Every set back and repair cost Plaintiff time and money. Delaying operations and service to customers. Within the past 3 months, Plaintiff ordered a new gearbox for one of Kannegiesser' s

ironers. Upon delivery the gear box appeared heavily damaged, even without removing it from the package and attempting to install it. Plaintiff's Vice President refuse to sign for it and contacted Mr. Dreher. Mr. Dreher informed him that in that event the delivery should be refused and the part shipped back. Dreher also informed the vice president that they had to re order the part from Germany since had none in stock. That would take, according to Mr. Dreher at least two weeks. Meanwhile, Defendant K-USA invoiced Plaintiff for freight and restock fee, in sum of $3,727.76. To make matters worse, when the Vice President contacted K-USA to reorder said part, he was told that once the part arrives to the plant, it was subject to "cash on delivery".

That particular part was, as promised by Mr. Dreher in his e-mails to Plaintiff's Vice President, subject to K-USA's "new" parts warranty. Meaning, the Defendant had to expeditiously replace the part, at no cost. After serious plant down time, Plaintiff ordered the part from a different manufacturer, with a clear understanding that given the fact that no data exists for Kannegiesser's parts which is available to third parties, such as a third party manufacturer, so they can only attempt to replicate the specific part.

(e)     In 2006, as part and parcel of a series of new equipment specially deigned and manufactured by K-Germany for the Plaintiff's new plant were 5 new industrial

capacity dryers. The dryers are driven by a component called inverter. On two out of five dryers, inverters failed during Summer of 2007. Kannegiesser Germany addressed the issue and send back the replacement part. On each dryer the inverters promptly failed in the summer of 2007. K-USA and K-Germany refused to repair the part or even adequately address the mass failure of dryers. The Plaintiff's Vice President was told that Plaintiff had to purchase new inverters. Interestingly, Phil Hart out of K-USA and J.Rauschmaier out of K-Germany, a top guy in sales and design department of drying equipment for Kannegiesser, each told the Plaintiff's vice president that they were not aware that any one else experienced issues with Kannegiesser's dryer's. The occurrence became too suspicious to Plaintiff's key personnel. In due course, Plaintiff's vice president contacted NORD, a manufacturer specializing in production and design of industrial size parts and equipment. Defective inverters were send out to NORD. Diagnostics showed that an internal component failed in all five inverters. A representative from NORD informed the Plaintiff's vice president that NORD was the one who manufactured that part for Kannegiesser's dryers. NORD repaired all five inverters for free.

A gentleman by name of Pete Schicker, a NORD North America inverter specialist, (upon information, NORD is a German multinational company) informed the

plaintiff's vice president that K-Germany was fully aware of the problem with inverters and the matter was discussed at length with NORD, the manufacturer. Yet both K-USA and K-Germany refused to forewarn the Plaintiff or assist the Plaintiff when the failures occurred.

In summer of 2008, inverters started failing again. Plaintiff's vice president was aware that the issue with inverter only came up when the temperature outside rose, i.e. summertime. From his experience with laundry equipment, he extrapolated by logic, that when the ambient (surrounding) temperature rises, the parts in the dryer fail to be cooled off sufficiently, likely caused by a design flow and/or less then sufficient testing. After all, if the equipment was specially designed for the Plaintiff thru an order placed with K-USA by a team working from K-Germany on design and manufacture of large scale equipment for a factory size setting, even if some components were purchased from third party manufacturer's, like NORD, the equipment should have gone thru rigorous testing prior to be installed into Plaintiff's plant where upwards of 85 workers can be on site at any one time. But, in summer of 2007, and likely prior to that, K-USA and K-Germany were made aware of the problem and they failed to take adequate measures.

At Plaintiff's own cost and expense, they are in the process of placing cooling agents into every single dryer so as to preclude a possibility of further failures and a

possible accident.

On August 5, 2008, Plaintiff's Vice president was informed by a third party who owns and operates a similar type plant in a different states that when he ordered a number of dryers from Kannegiesser USA with the past 18 months, they came with a totally different form and extended function the for inverters, adequately cooling the equipment even as the ambient temperature raises in the summertime.

At no time did the Defendants offer to replace or upgrade the deficient inverters.

(f)       An integral part of a shuttle which brings dirty linen from the washing machine to other and further stations on the washing-drying cycle for laundry, is called a festoon. The part carries high voltage wires and upon a break down, the whole apparatus comes to a screeching holt. In winter of 2006, upon installation of the apparatus for washing and drying, festoons were installed into the Plaintiff's new plant by K-USA service personnel. The first break down of the festoon occurred within the first 4 months of the initial installation. The whole washing-drying apparatus came to a holt. K-USA and K-Germany were put on notice. The Defendant's refused to address the issue aside from sending to Plaintiff's plant a tiny basket containing a small modular piece to replace within the giant festoon basically to act as a bandage. No service personnel were dispatched. During the past 2 years, the festoon broke on at least 50 occasions. Every

break down leads to a complete shut down of the conveyer and the accompanying apparatus. Every subsequent time the break down occurred, Defendants did nothing. Plaintiff was forced to buy spare parts out of pocket. That is not the major component of the problem. Each time the conveyer goes down due to a break down of the festoon, thousands of dollars are expended for time and labor. When in January 31, 2007 the Plaintiff's Vice President went to K-Germany's plant to talk "shop", that was on of the issues discussed at length. Still, nothing happened. At most, a new bandage was send over.

73.    Upon information and belief, this was due to a design flaw. During numerous conversations pertaining to the issue of festoons, Mike Dreher told Plaintiff's President that they were intentionally sabotaging the festoons.

74.    Upon information and belief, at the time of all of the aforementioned representations and/or statements and/or promises by Defendants, their agents, employees and principals, regarding the parts, supplies, equipment, design, manufacturing, services and repair, of Kannegiesser equipment and parts, the Defendants had no intention to performing or keeping true to their promises and representations. As such they have defrauded the Plaintiff, have intentionally induced the Plaintiff to enter into a series of agreements and purchases with them,

both individually and collectively, have intentionally failed to disclose their corporate policies and practices, actual as well as contemplated, with regard to reeling in a potential sizable client and subsequently, unless such client continues to purchase new expensive equipment is given to cavalier disregard for the funds needlessly squandered by client during operation of its business towards repair, service and replacement of parts and equipment.

75.    Furthermore, Defendants failed to inform Plaintiff of the massive and potentially very dangerous flaw in their inverters.

76.    B&M relied upon the promises, representations, and omissions of Defendants during the negotiations leading to the execution of the initial series Purchase Order Agreements as well as the subsequent orders for equipment, parts and service.

77.    Specifically, in reliance upon Defendants, B&M, among other things, entered into the Purchase Order Agreements for industrial size equipment designed, tested, manufactured and serviced by Defendant corporate entities which in fact were and still are responsible for running over 85% of the Plaintiff's plant.

78.    During that crucial time period, B&M had no knowledge of the falsity of defendants' representations, defendants' intent not to perform as promised, and the existence and materiality of defendants' omissions.

79.    As the result of defendants' false promises and material misrepresentations and B&M's detrimental reliance upon defendants' fraudulent conduct, B&M has sustained economic and other injuries, for which he seeks compensation from defendants in the form of monetary damages in the amount to be determined by the jury at trial.

80.    In addition, because fraudulent acts of the defendants were committed knowingly, intentionally, recklessly, and with a conscious disregard for the rights of B&M, B&M seeks to recover punitive damages from defendants in an additional amount to be determined by the jury at trial.

## COUNT NINE - NEGLIGENT MISREPRESENTATION BY K-USA, K-GERMANY, MR. K AND MR. D

81.    B&M hereby realleges and incorporates the allegations set forth in Paragraph 1 through 81, above.

82.    During the negotiations for the equipments and parts agreement, which included, inter alia, service, warranty, on equipment and parts, the Defendants represented to B&M that jointly and severably, each and all would use diligent efforts to design, test, manufacture equipment and parts for Plaintiff's plants of top quality, durability and workmanship, as well as to subsequently service their equipment and pars in the event a tuning, repair, replacement or upgrade was ever needed; the Defendants furthermore promised to do so in a highly expedition

manner being fully aware that they equipment is what keeps the Plaintiff's plant operational and the operation must proceed 365 days a year. During negotiations between parties which culminated in multimillion dollar purchase orders it was discussed at length by the parties that Plaintiff's goal, as with any prudent business, was to police expenses and operate the plant with a goal of profit maximizing while providing top level service to their hospitality clientele; this was essential to the symbiotic nature of the parties' relationship, being that the Plaintiff's plant was run 85% on strictly Kannegiesser production and products and as the end result of that fact, was an integral component of every transaction between the parties so as to obtain mutually beneficial returns on the transactions contemplated in the Agreements. Additionally, Defendants made certain representations with respect to the manner in which they would handle their operations, including design, manufacture, testing, delivery, installation, start-up, performance, durability, service, repair and replacement and support so as to ensure excellence in their performance of its duties vis-a vis-Plaintiff and its needs.

83.     Defendants also had a duty to timely disclose and provide B&M with accurate, timely and complete information respecting possible flaws and defects in their design, testing, manufacture and production of equipments and parts as well as to timely inform Plaintiff of needed maintenance, repair and upgrades to their Kannegiesser equipment and parts. .

84.    The foregoing representations were false when made.

85.    Defendants had a duty to disclose that material information, but failed to do so.

86.    Upon information and belief, at the time of the aforementioned representations and omissions, Defendants knew of the falsity of those representations or, in the alternative, acted with careless and reckless disregard as to the truth thereof. Further, Defendants knew of the materiality of their omissions or, in the alternative, acted with careless or reckless disregard with respect to the materiality thereof.

87.    B&M relied upon the representations made by Defendants. Plaintiff entrusted Defendants with outfitting close to 85% of their plant with Kannegiesser's equipment, run on Kannegiesser's parts, serviced by Kannegiesser's personnel and supplying Plaintiff with equipment for day to day operation of Plaintiff's plant, upon which operation depended B&M's income, profit, bottom line and good business reputation, essential in their line of work. Instead, due to Defendants acts and omissions, as results of which equipment malfunctioned, parts failed, third parties' goods were damaged, Plaintiff's plant suffered tremendous down time, Plaintiff paid out huge fees in overtime, needless freight and restocking charges were imposed upon Plaintiff by Defendants, Plaintiff's customers became disgruntled and many left, goof business name was lost, potential and actual income was lost..

88.     At the time of his reliance thereon, B&M had no knowledge of the falsity of defendants' representations.

89.     Defendants committed acts constituting negligent misrepresentation.

90.     As the result of B&M's detrimental reliance upon defendants' negligent misrepresentations, B&M has sustained economic and other injuries, for which Plaintiff seeks compensation from Defendants in the form of monetary damages in an amount to be determined by the jury at trial.

91.     In addition, because the negligent acts of defendants were committed recklessly and/or with a conscious disregard of the rights of B&M, defendants are guilty of gross negligence. Accordingly B&M seeks to recover punitive damages from defendants in an additional amount to be determined by the jury at trial.

## COUNT TEN - NEGLIGENCE AND GROSS NEGLIGENCE BY K-USA, K-GERMANY, MR. K and MR. D

92.     B&M hereby realleges and incorporates the allegations set forth in Paragraph 1 through 92, above.

93.     Some time in late Spring of 2007, about May, 2007, Plaintiff placed an order for software program upgrade and vertical information modification with K-USA. The software program pertained to operation of the data hand-off by and between the rail system and the

washer apparatus, all for the Kannegiesser equipment.

94.     On or about October-November 2007, K-USA delivered to Plaintiff one soft ware package. The intent was to manufacture one package and if that functioned well within the required parameters, for K-USA to proceed to a production of two additional soft ware packages designed for the other two out of three tunnels. When the order for soft ware was negotiated, K-USA informed Plaintiff's representative that for a sum of about $5,000.,00 they would send their service personnel to install the soft ware. A second option for installation was given to Plaintiff. Their own personnel could install the software at no fee. Either option, as told by K-USA's representative Mr. Phil Hartman was viable.

95.     Upon receipt of manual for installation of soft ware, the plaintiff's Vice President realized that it was a very simple process for any one more acquainted with personal computers. In his approximations, the process, if the manual was followed to the "t" would take about five minutes and entail connecting 5 wires. The software came some time in late November 2007. After following the installation instructions word for word, the vice President resized that a key component of the program was none functioning. He contacted K-USA and asked them to re-configure the program. A new flash card was dispatched with "corrected" data some time in late March-early April 2008. but, right after the installation and every two hours upon two hours

subsequent to that, for a period of approximately a week, the tunnel where the soft ware upgrade

was implemented would shut down, bring the 1/3 of the whole plant to the stand still.

96. In late April, 2008, Kannegiesser send a number of detailed of instructions on

how to abate the software malfunction problem.

97. As the result of the software glitch, Plaintiff paid over time, and dealt with

extensive complaints from dissatisfied clients with late deliveries.

98. To date Plaintiff's agents and employees believe, in good faith, that the fact that

Plaintiff's Vice President elected to install the soft ware on his own and elected not to pay K-

USA an installation fee in sum of $5,000.00 was at the root of the problem.

99. As such, in addition to all of the above stated, B&M hereby realleges and

incorporates the allegations set forth in Paragraph 1 through ___, above.

100. In connection with the special nature of the relationship between the Defendants

and Plaintiff, rooted solidly in the fact that close to 85% of Plaintiff's plant, and as such business

operation and income, run on Kannegiesser specially designed equipment and outfitted with their

parts and serviced by their personnel, each of which Defendants had a full and complete

knowledge of, and was remained of on basically daily bases via e-mail, letters, phone calls, and

back and forth in person factory and plant visits Defendants owed to B&M a duty of special care.

Alternatively, Defendants owed to B&M a duty of ordinary care.

101.    Defendants breached not only their higher duty of care, but have also failed to meet the standard of ordinary care, by *inter alia*, failing to properly design, manufacture, as well as timely and properly test, a service, maintain, repair, replace their equipment and parts, as results of which equipment malfunctioned, parts failed, causing equipment and additional parts to be further damaged; as additional result of the stated, third parties' goods were damaged, Plaintiff's plant suffered tremendous down time, Plaintiff paid out huge fees in overtime, needless freight and restocking charges were imposed upon Plaintiff by Defendants, Plaintiff's customers became disgruntled and many left, goof business name was lost, potential and actual income was lost. Theses breaches constitute common law negligence.

102.    Defendants' negligence has proximately caused injury to B&M, for which B&M seeks legal relief in the form of monetary damages, in an amount to be determined by the jury at trial.

103.    In addition, because Defendants' negligence has been gross, reckless and/or willful, B&M seeks an award of punitive damages in an amount to be determined by the jury at trial.

## COUNT ELEVEN - INTENTIONAL INTERFERENCE WITH THE PERFORMANCE OF OBLIGATION AND INDUCEMENT IN THE BREACH THEREOF BY ALL

## DEFENDANTS

104.    B&M hereby realleges and incorporates allegations set forth in Paragraph 1 through 104, above.

105.    Defendants repeatedly and willfully interfered with B&M's ability to perform its obligations, agreement and contracts with its customers and clientele, such as numerous hotels, causing Plaintiff to beach , under perform, delay performance of, fail to perform to customers' expectation, (such expectations not only rooted in agreements entered into by Plaintiff with its hospitality industry clientele, but also largely based on Plaintiff's stellar past performance with respect to those specific clients and by word of mouth in the hospitality industry of Plaintiff's past performance) , all without B&M's prior consent. Examples of such conduct by Defendants include, but are not limited to:

106.    In 2005 , among other top tier hotels, B&M serviced as a linens and laundry service Le Parker Meridian Hotel, Mandarin Orient Hotel, Shoreham Hotel and Mansfield Hotel, all in New York City. Each of the hotels were serviced by Plaintiff about one year when, all three hotels, terminated their relationship with Plaintiff due to, *inter alia,* excessive damage to their linens. The damage was directly caused by equipment designed, manufacturer, sold and serviced for Plaintiff by Kannegiesser. The linens were routinely torn to shreds by the machines resembling shark's feeding frenzy.

The major but not the exclusive culprit was a machine, specially designed for the Plaintiff by Kannegiesser, called EMS. EMS was special ordered for the new plant and became operational only in January 2006, after Defendant K-USA's personnel installed it in the new plant and hooked it up to other Kannegiesser machines. Problems ensued within the first 6 months of the installation and hook-up to other Kannegiesser machines and progressed into a fevered pitch when time after time linens were torn to shreds, burned to smithereens and torn apart like cotton balls. Hundreds of thousands of dollars of client's linen was lost, destroyed and/or damaged. Additionally, because of the above, the plant would basically have to come to a complete shut down.

107.    In response to basically daily calls and e-mails, Defendants, both out of K-USA and K-GERMANY, as well as Mr. D personally, and through their agents and employees, as well as service personnel employed by both, delayed repair and service , did not properly diagnose the issues, did not adequately and completely repaired, both equipment and parts.

108.    Above in turn caused damage and destruction to countless linens of the highest cost and quality, commensurate with the types of hotels using the said linens, delay in servicing of said hotels by Plaintiff who had to slow down and/or shut down the linen servicing at the plant. This in turn disrupted the day to day orderly operation of the Plaintiff's customers and

clientele, thereby inducing Plaintiff to breach their agreements with their customers.

109.    By virtue of the above, the following hotels were lost as Plaintiff's clientele: the Mandarin Oriental Hotel,  Mansfield Hotel and Shoreham Hotel.

110.    Cumulatively, the above three hotels due to destroyed and damaged linens refused to pay to Plaintiff a sum in excess of $25,000.00. Furthermore, the effect of such destruction and under-performance, over time , build into a crescendo of discontent. As the direct result of the above, on or abut May, 2006 each of the three hotels terminated their relations with Plaintiff.

111.    Cumulatively the above three hotels would produce revenues for Plaintiff in excess of $1,500,000.00 **per year**. That revenue was irretrievably lost to plaintiff.

(b)    As the direct result of the above actions and inactions on part of Defendants, after suffering mind boggling losses of fine linen which belonged to certain of B&M's clientele, Plaintiff had to pay penalties to third parties.

(c)    In addition to all above stated, the top tier hospitality industry clientele through their key executive personnel "talk shop". The fact as happened above and told and re-told through echelons of top brass management through the net work of top 100 hotels within NYC is truly bad publicity for the Plaintiff.  The above besmirched Plaintiff's good name and reputation

in the tight knit top shelf hospitality industry. The good faith opportunity loss is tough to set in numbers and should be left for the jury to decide.

112.   Defendants repeatedly refused to take into consideration B&M's requests, reports and on the site studies concerning overwhelming and well documented problems their equipment and parts experienced during the relevant time period ; Defendants, jointly and severably, refused to take into consideration Plaintiff's skillful advice on the ways to resolve and/or correct problems pointed out by B&M. Additionally, Defendants, jointly and severably, but quite repeatedly refused to address or to make timely corrections to the issues and problems pointed out by B&M.

113.   For example, Plaintiff has begged Defendants correct the issue with the destruction of linen as stated above. Only much, much later, was the equipment which was the biggest culprit of destruction was taken back by Kannegiesser and replaced with a totally different equipment. Upon information and belief, the cost of the undue and unreasonable delay exceed $1,000,000.00 in actual losses and consequential losses.

114.   Defendants acts and omissions were intentional, knowing and without reasonable justification, economic or therewith.

115.   Defendants actions and omissions constituted intentional interference with

performance of the agreements for laundry service between Plaintiff and various of their customers, including all due and orderly transactions contemplated thereby, and did and as the direct result of which, deprived B&M of compensation to which it was entitled to under the agreements. Additionally, numerous customers ceased doing business with the Plaintiff, also as the direct and consequential result of the above stated.

116.    Additionally, if the Defendants would have performed their obligations towards Plaintiff in a reasonable businesslike manner by, among other things, timely addressing various problems with design and production, of equipment and parts, timely service and maintenance as requested, and implementation of timely upgrades in equipment and soft ware programs, Plaintiff would have earned profit of which it was clearly entitled, would not loose valuable clientele and would not loose outstanding business reputation in a highly competitive and very intimate industry.

117.    As the result of Defendants' actions and omissions B&M has sustained economic and other injuries, for which he seeks compensation from defendants in the form of monetary damages in an amount to be determined by the jury at trial.

118.    Furthermore, in addition to the above stated, the conduct of Defendants with respect to B&M was intended to cause the foregoing harm to B&M. Additionally, Defendants'

acts and omissions were without cause and justification.

119.    As the result of Defendants actions and omissions B&M has sustained economic and other injuries, for which it seeks compensation from Defendants in the form of monetary damages in an amount to be determined by the jury at trial.

120.    In addition, because Defendants' acts and omissions have been gross, reckless and/or willful, B&M seeks an award of punitive damages in an amount to be determined by the jury at trial.

## COUNT TWELVE– BREACH OF IMPLIED WARRANTY OF MERCHNTABILITY BY K-USA AND K-GERMANY

121.    B&M hereby realleges and incorporates allegations set forth in Paragraph 1 through 121, above.

122.    At all relevant times, K-USA was a merchant engaged in the sale of laundry equipment, parts and supplies.

123.    At all relevant times, K-Germany was a manufacturer of laundry equipment, such as ironers, inverters, folders, etc…

124.    Beginning in 2001 and till September of 2008, Plaintiff has purchased from Defendant K-USA Equipment, including various machines to wash, iron, and fold laundry.

125. The Equipment B & M purchased from K-USA was, upon information and belief, manufactured by Defendant K-Germany.

126. In addition to the warranties of the Defendants that each piece or unit of the Equipment was of merchantable quality, that it contained no latent defects, and that it would perform the work for which it was designed and sold, B & M relied on the "brand name" of the Equipment and the extensive advertising in media and in person to B & M, by each of the Defendants, extolling virtues and superior qualities of each unit of Equipment

127. Defendants K-USA and K-Germany were advised and knew that B&M purchased the Equipment, each piece individually and all collectively, for the purpose of large size laundry plant.

128. In purchasing the equipment, B&M relied upon the skill, judgment and experience of Defendants.

129. The Equipment was not of the character and quality warranted and represented by Defendants, but on the contrary, was grossly and irreparably defective. The equipment did not and would not operate and function properly because of various defects and imperfections in the Equipment, including, inter alia, within the Equipments' design, composition, and manufacture, which resulted in Plaintiff's being unable to use the equipment

for the Purpose for which it was sold.

130.     Upon becoming aware of the defects and imperfections of the Equipment, with respect to each unit or piece thereof, its unsuitability for the work for which it was sold and its general unmerchantability, B&M within a reasonable time, notified Defendants of the defects within the Equipment.

131.     As a result of the defective condition of the equipment, and as a direct and proximate result of defendants' refusal to make available to B&M within a reasonable time, substitutes for the Equipment of good, proper and merchantable quality, Plaintiff has sustained consequential damages in excess of $1,000,000.00

132.     As the direct result of the Defendants' breach, B&M has been damaged in the amount well exceeding $2,500.000.00 , representing the difference in the value of the equipment as accepted and the value and the value it would have had if it had been delivered as warranted, and in the amount exceeding $1,000,000.00 representing B&M's consequential damages, including, inter alia, such matters as equipment and plant shut down , over time, loss of business.

133.     By reason of the aforesaid, B&M was damaged  B&M has sustained economic and other injuries, for which Plaintiff seeks compensation from Defendants in the form of monetary damages in an amount to be determined by the jury at trial.

134.    In addition, because the acts of Defendants were committed recklessly and/or with a conscious disregard of the rights of B&M, B&M seeks to recover punitive damages from defendants in an additional amount to be determined by the jury at trial.

## COUNT THIRTEEN– BREACH OF IMPLIED WARRANTY AS TO FITNESS FOR PARTICULAR PURPOSE.

135.    B&M hereby realleges and incorporates allegations set forth in Paragraph 1 through 135, above.

136.    At all relevant times, K-USA was a merchant engaged in the sale of laundry equipment, parts and supplies.

137.    At all relevant times, K-Germany was a manufacturer of laundry equipment, such as ironers, inverters, folders, etc…

138.    Beginning in 2001 and till September of 2008, Plaintiff has purchased from Defendant K-USA Equipment, including various machines to wash, iron, and fold laundry.

139.    The Equipment B & M purchased from K-USA was, upon information and belief, manufactured by defendant K-Germany.

140.    As the result of the extensive communications between B&M and Defendants, Defendants had knowledge of the exact and specific purpose for which said Equipment (and each piece thereof) was purchased and warranted the same to be fit and proper for such purpose and

warranted the same to be fit and proper for such purpose.

141.    Defendants have therefore breached the implied warranty of fitness for the particular purpose because in each instance they were made aware of the specific purpose for which B&M would be implementing each and every piece of the Equipment.

142.    B&M relied upon said warranties and attempted to use the said Equipment for the purpose of performing laundry services, including but not limited to : washing, drying, ironing folding and utilizing software equipment specifically designed for their operations by Defendants to run said laundry operation and all equipment therein, but the Equipment poorly or wrongly designed, poorly manufactured, failed to work as promised, worked with constant break down, malfunctions and interruptions in service, and was blatantly unfit for use in a large scale laundry facility.

143.    The value of said Equipment at the time of delivery thereof had it answered to said warranties would have been well in excess of $2,500,000.00 Dollars, the sum plaintiff paid and that it was actually of the value of less then 10% of that price.

144.    As soon as B&M learned of the unfitness of that Equipment, for the purposes intended and for which it was bought, it notified Defendants and offered to return the Equipment, but Defendants refused to accept the Equipment and repay the entire purchase price

thereof.

145.    To date, the software package, specifically designed to fit the equipment and the "smooth" running thereof at the B&M's facility, which is just one of the numerous outstanding issues, constantly malfunctions, bringing the plant to a virtual stand still. B&M's personnel communicated the issue to Defendants immediately upon receipt of the software. The matter is still not resolved although e-mails between the parties flow daily.

146.    By reason of the aforesaid, B&M was damaged  B&M has sustained economic and other injuries, for which Plaintiff seeks compensation from Defendants in the form of monetary damages in an amount to be determined by the jury at trial.

147.    In addition, because the acts of Defendants were committed recklessly and/or with a conscious disregard of the rights of B&M, B&M seeks to recover punitive damages from defendants in an additional amount to be determined by the jury at trial.

## COUNT FOURTEEN  - BREACH OF EXPRESS WARRANTY BY K-USA AND K-GERMANY

148.    B&M hereby realleges and incorporates allegations set forth in Paragraph 1 through 148, above.

149.    At all relevant times, K-USA was a merchant engaged in the sale of laundry equipment, parts and supplies.

150.    At all relevant times, K-Germany was a manufacturer of laundry equipment, such as ironers, inverters, folders, etc…

151.    Beginning on about 2001 till September 2008 , Plaintiff has purchased from Defendant K-USA Equipment, including various machines to wash, iron, and fold laundry.

152.    The Equipment B & M purchased from K-USA was, upon information and belief, manufactured by defendant K-Germany.

153.    In addition to the warranties of the Defendants that each piece or unit of the Equipment was of merchantable quality, that it contained no latent defects, and that it would perform the work for which it was designed and sold, B & M relied on the "brand name" of the Equipment and the extensive advertising in media and in person to B & M, by each of the Defendants, extolling virtues and superior qualities of each unit of Equipment.

154.    More specifically, and to supplement the above, Kannegiesser has a very extensive web advertisement on the world wide web. Each one of their machines or equipment, is described in detail including how it works, what it does and why it's "better" then same or similar items offered by the company's competitors. Copies of certain pieces of Equipment purchased by B&M in reliance upon all the afore mentioned are attached hereto as Exhibit F (copies of all such ads per piece of Equipment are too voluminous to be attached hereto but are

readily available on the company's web pages and on file).

155.     Defendants K-USA and K-Germany were advised and knew that B&M purchased the Equipment, each piece individually and all collectively, for the purpose of laundry.

156.     In purchasing the equipment, B&M relied upon the skill, judgment and experience of Defendants as well as upon written representation as to the quality of the Equipment found in print.

157.     The Equipment was not of the character and quality warranted and represented by Defendants, but on the contrary, was grossly and irreparably defective. The equipment did not and would not operate and function properly because of various defects and imperfections in the Equipment, including, inter alia, within the Equipments' design, composition, and manufacture, which resulted in Plaintiff's being unable to use the equipment for the Purpose for which it was sold.

158.     Upon becoming aware of the defects and imperfections of the Equipment, with respect to each unit or piece thereof, its unsuitability for the work for which it was sold and its general unmerchantability, B&M within a reasonable time, notified Defendants of the defects within the Equipment.

159.     As a result of the defective condition of the equipment, and as a direct

and proximate result of defendants' refusal to make available to B&M within a reasonable time, substitutes for the Equipment of good, proper and merchantable quality, Plaintiff has sustained consequential damages in excess of $250,000.00

160.    As the direct result of the Defendants' breach, B&M has been damaged in the amount well exceeding $2,500.000.00 , representing the difference in the value of the equipment as accepted and the value and the value it would have had if it had been delivered as warranted, and in the amount exceeding $1,000,000.00 representing B&M's consequential damages, including, inter alia, such matters as equipment and plant shut down , over time, loss of business.

161.    By reason of the aforesaid, B&M was damaged  B&M has sustained economic and other injuries, for which Plaintiff seeks compensation from Defendants in the form of monetary damages in an amount to be determined by the jury at trial.

162.    In addition, because the acts of Defendants were committed recklessly and/or with a conscious disregard of the rights of B&M, B&M seeks to recover punitive damages from defendants in an additional amount to be determined by the jury at trial.

## COUNT FIFTHTEEN - ATTORNEYS' FEES

163.    B&M hereby realleges and incorporates allegations set forth in Paragraph 1

through 163, above.

164.    Because of the wrongful and illegal conduct of Defendants, B&M has been required to retain the undersigned counsel to represent him in the preparation, filing, and prosecution of this action.

165.    Accordingly, B&M seeks to recover , in addition to relief set forth in the foregoing counts, his reasonable and necessary attorneys' fees incurred in connection with this action and the assertion of their claims herein.

# VI.

## JURY DEMAND

166.    Pursuant to rule 36(b) of the Federal Rules of Civil Procedure, B&M hereby demands a trial by jury of all issues set forth in this Complaint and all issues which may hereafter arise in this action which are triable of right by a jury.

# VII.

## REQUEST FOR RELIEF

167.     In consideration of the foregoing, B&M hereby requests that, upon trial by jury, this Court enter a judgment in his favor and against Defendants, jointly and severally, providing for the following relief:

a.     An award of actual damages, both compensatory and consequential in an amount to be determined by the jury;

b.     Punitive damages in the amount to be determined by the jury;

c.     An order of restitution in an amount to be determined by the Court or the jury;

d.     Attorneys' fees ;

e.     Costs of Court;

f.     Pre-judgment and post-judgment interest at the highest rate(s) allowed by law; and

g.     Such further relief which this Court may deem appropriate and to which B&M is entitled.

Dated: New York New York
        November 13 , 2008

Respectfully submitted,
Law Offices of Marina Tylo, Esq.
By: _____
        Marina Tylo (MT-7178)
2807 Ocean Avenue, Suite 2
Brooklyn, New York, 11229
(718) 934-4902


ATTORNEY FOR PLAINTIFF

STATE OF NEW YORK, COUNTY OF Kings , SS.:

I, Miron Markus , being duly sworn, depose and say that:  I am the president of the Plaintiff corporation in the within action; I have read the foregoing Complaint and know the contents thereof; the contents of the Complaint are true to my knowledge, except as to those matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

_____,

Miron Markus

Subscribed and sworn to before me
on August , 2008
october 29

_____
                    Notary Public
My commission expires on

**MARINA TYLO**
Notary Public, State of N.Y.
Commission Number 02TY6117088
Kings County
Expiration 10/18/c.