UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

B&M LINEN, CORP.

                              Plaintiff,

-against-

KANNEGIESSER, USA, CORP., MICHAEL H. DREHER, MARTIN KANNEGIESSER, and HERBERT KANNEGIESSER GMBH & CO.,

                              Defendants.

08 Civ. 10093

**MEMORANDUM OPINION AND ORDER**

Richard J. Holwell, District Judge:

      This action arises from a protracted dispute about commercial laundering machinery. A launderer, B&M Linen Corporation ("B&M"), brings a variety of contract and tort claims against Kannegiesser, USA, Corp. ("K-USA"), the company that built much of its laundering machinery; Herbert Kannegiesser GmbH & Co. ("K-Germany"), which allegedly controls Kannegiesser; Michael H. Dreher, K-USA's President; and Martin Kannegiesser, K-Germany's managing partner and executive officer (collectively, "defendants"). The defendants have moved to dismiss most of the tort claims and all of the claims against Dreher. For the reasons given below, the Court grants that partial motion to dismiss in its entirety.

## BACKGROUND

      For purposes of this motion, the following allegations are taken as true.

      Miron Markus formed B&M in 1992 to provide laundry services to clients in the hospitality industry. (Compl. ¶ 13.) B&M operated from a facility in the Bronx from 1992 to

2006, when it moved operations to a new plant in the same area. (*Id.* ¶ 14.) The new facility uses a conveyer line of machinery to sort, load, wash, rinse, wring, press, and fold linens. (*Id.* ¶ 14.) Most of the machinery is interconnected and centrally controlled by specially designed computer software. (*Id.* ¶ 14.) A malfunction in any of the machines can bring the entire system to a halt. (*Id.* ¶ 14.)

K-Germany manufactures machinery of the sort B&M uses in its laundry facility. (*Id.* ¶ 16.) K-USA is apparently the company that sells, installs, and repairs K-Germany's products for customers in the United States, though the complaint does not spell out the exact relationship between the two. (*Id.* ¶ 16.) B&M's first contact with K-USA occurred in 2001, at a hospitality industry trade convention. (*Id.* ¶ 16, 17.) After the convention, Miron Markus spoke with representatives from several companies, including K-USA, about the prospect of purchasing laundry machinery. (*Id.* ¶ 17.) In the summer of 2001, Dreher visited B&M's facility to discuss B&M's needs and K-Germany's product offerings. (*Id.*) After Markus visited Germany to see K-Germany's manufacturing operations for himself, B&M decided to buy its equipment from K-USA. (*Id.* ¶¶ 18, 19.) From mid-2001 to early 2005, B&M ordered more than five hundred thousand dollars' worth of equipment from K-USA. (*Id.* ¶ 20.)

In the early stages of B&M's relationship with the defendants, they quickly and efficiently resolved problems with their equipment. (*Id.* ¶ 21.) B&M believes that this was part of defendants' "scheme" to increase its dependence on Kannegiesser products and services; once B&M became dependent on the defendants, they began to ignore its complaints. (*Id.* ¶¶ 22, 24.)

In 2004[1], B&M decided to move its operations to a new facility and to upgrade equipment. (*Id.* ¶ 24.) K-Germany promised to design and manufacture customized products for

---

[1] Although B&M allegedly made the decision to move its operations in 2004 (Compl. ¶ 24), it did not actually move to the new plant until 2006. (*Id.* ¶ 14.)

2

B&M, which it assured were of "superior quality and durability." (*Id.* ¶¶ 25, 26.) Relying on these promises, B&M placed a large order with the defendants for equipment to be delivered and installed at the new plant. (*Id.* ¶¶ 27, 28, 30.)

As the equipment arrived at B&M's new facility, various problems, including design defects and manufacturing errors, became apparent almost immediately. (*Id.* ¶ 31.) Defendants also failed to meet certain agreed-upon deadlines. (*Id.* ¶ 31.) And when B&M asked for a refund on defective equipment, defendants refused, even though defendant Dreher had assured B&M in 2005 that defective equipment could be returned. (*Id.* ¶¶ 32, 46.) To date, significant problems with the defendants' machinery persist at B&M's new plant. (*Id.* ¶ 39.) It is B&M's belief that defendants knew of these problems from the beginning but have refused to accept blame for their mistakes. (*Id.* ¶ 35.) Defendants have performed only "minimal repairs or replacements, most done at Plaintiff's cost and expense." (*Id.* ¶ 39.)

On March 5, 2009, B&M filed a First Amended Complaint against the defendants, alleging claims sounding in tort and contract. Defendants have since moved to dismiss many of plaintiff's claims, including its fourth claim, for breach of fiduciary duty; fourteenth claim, for fraud; eighth claim, for misrepresentation; fifteenth claim, for negligent misrepresentation; tenth claim, for intentional interference with business obligations; and sixteenth claim, for attorneys' fees. Defendants have also moved to dismiss all of B&M's claims against defendant Dreher.

**DISCUSSION**

**I.     Standard**

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 692 (2d

Cir. 2009). The complaint's allegations, however, "must be enough to raise a right of relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Only a "plausible claim for relief survives a motion to dismiss." *LaFaro v. New York Cardiothoracic Group, PLLC*, 570 F.3d 471, 476 (2d Cir. 2009). Thus courts are "not bound to accept as true a legal conclusion couched as a factual allegation," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949–50 (2009) (internal quotation marks omitted).

## II. Breach of Fiduciary Duty Claim

Defendants have moved to dismiss plaintiff's claim for breach of fiduciary duty. The elements of that claim are: (1) the existence of a fiduciary relationship between the parties and (2) breach of the fiduciary duty. *See Cramer v. Devon Group, Inc.*, 774 F. Supp. 176, 184 (S.D.N.Y. 1991). Under New York law, courts do not determine the existence of a fiduciary relationship "by recourse to rigid formulas." *Scott v. Dime Sav. Bank*, 886 F. Supp. 1073, 1078 (S.D.N.Y. 1995) (citing *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 767 F. Supp. 1220, 1231 (S.D.N.Y. 1991)). Courts instead "conduct a fact-specific inquiry into whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge." *Facella v. Fed'n of Jewish Philanthropies of New York, Inc.*, No. 98 Civ. 3146, 2004 WL 1700616, at *6 (S.D.N.Y. July 30, 2004) (citation omitted). Still, "[a]bsent extraordinary circumstances, . . . parties dealing at arm[']s length in a commercial transaction lack the requisite level of trust or confidence between them necessary to give rise to a fiduciary obligation." *Henneberry v. Sumitomo Corp. of America*, 415 F. Supp. 2d 423, 460 (S.D.N.Y. 2006); *see Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 679 (S.D.N.Y. 1991) ("Where parties deal at arm[']s length in a commercial transaction, no relation of confidence or trust

4

sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances.").

B&M's amended complaint is filled with legal conclusions and hazy factual claims, but it lacks sufficient allegations to make it plausible that the plaintiff had a fiduciary relationship with the defendants. The complaint, for example, baldly claims that a fiduciary duty exists "[b]y virtue of rights and obligations created by and set forth in the [Purchase Agreement ("PA")] I and PA II, as well as by virtue and as the direct result of the exact nature of relationship [sic] which was created, cultivated and existed between the Defendants, and each one of them and Plaintiff." (Compl. ¶ 56.) What it fails to explain is *why* the parties' relationship is plausibly different from a typical arm's length commercial transaction between a buyer and a seller. B&M points to the fact that defendants manufactured a high percentage of its equipment and designed customized software to run that equipment. (*Id.* ¶ 57.) But this relationship, as pled, is the definition of arm's length.

The authorities B&M relies upon in its opposition to the defendants' motion to dismiss are not to the contrary. The plaintiff cites *Fortino v. Hersh*, 764 N.Y.S.2d 25, 26 (N.Y. App. Div. 2003), for the proposition that an insurance agent may owe a fiduciary duty to his client; but in that case, the court so held because there were issues of fact regarding whether the agent "assumed the role of an investment advisor to the plaintiff[s]." *Id.* B&M does not allege that defendants occupied an analogous advisory role. B&M also cites *Mobil Oil Corporation v. Rubenfeld*, 339 N.Y.S.2d 623, 634–35 (N.Y. Civ. Ct. 1972), for the proposition that a franchisor-franchisee agreement might give rise to a fiduciary duty. B&M does not mention, however, that *Mobil Oil* was reversed on appeal with the observation that New York does not infer fiduciary relationships from franchising agreements. *See Mobile Oil Corp. v. Rubenfeld*, 370 N.Y.S.2d

5

943, 947 (N.Y. App. Div. 1975). B&M's complaint alleges a series of transactions even more plainly at arm's length than in *Mobil Oil*. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (no fiduciary duty where defendant "had little discretion to exercise, his obligations under the contract being straightforward and fixed").

The complaint also alleges that defendants were aware of the importance of their equipment to B&M's enterprise. (Compl. ¶ 62 ("If any of the equipment failed to work properly, the Plaintiff's plant basically come [sic] to a halt.").) While this may be an argument for awarding consequential damages in the event the Court finds a contract was breached, it does not approach the kind of factual allegation required to suggest a fiduciary relationship exists. Because B&M's pleadings are inadequate to support its fourth claim, that claim is dismissed.

### III. Fraud and Intentional Misrepresentation Claims

Defendants have moved to dismiss B&M's claims for fraud and intentional misrepresentation. The elements of common-law fraud and intentional misrepresentation under New York law are the same. *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir. 1998). In either case, a plaintiff must show that: "(1) the defendant made a material false statement or omission; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied upon the representation or omission; and (4) the plaintiff suffered damage as a result of such reliance." *Cent. Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 218 (S.D.N.Y. 2007).

A fraud claim will not survive if it merely restates a claim for breach of contract. *Bridgestone*, 98 F.3d at 19–20. Even a deliberately false statement that the defendant intends to perform on a contract, when he does not, will not suffice. *Id.* at 19. To maintain a fraud claim alongside a breach-of-contract claim, a plaintiff must (1) "demonstrate a legal duty separate from

the duty to perform under the contract"; (2) "demonstrate a fraudulent misrepresentation collateral or extraneous to the contract"; or (3) "seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Id.* at 20.

Some of the examples B&M cites of defendants' fraud are merely allegations that defendants breached contractual obligations they owed B&M. For example, B&M alleges that the defendants promised to "use diligent efforts to design, test, [and] manufacture equipment and parts for Plaintiff's plants of top quality, durability and workmanship, as well as to subsequently service their equipment and parts in the event a tuning, repair, replacement or upgrade was ever needed." (Compl. ¶ 85.) This allegation is essentially a restatement of paragraph 42 of the complaint, which alleges that defendants breached their contractual obligations. Similar breach-of-contract claims are repackaged as fraud claims throughout the complaint. In one place, the plaintiff claims that defendants reneged on a promise to put a particular sub-contractor, Mr. Durrant, "in charge of installation and calibration of Kannegiesser equipment at a new plant." (*Id.* ¶ 170(2).) In another, B&M accuses the defendants of attempting to shirk their contractual duty to solve problems that arose with defendants' laundering equipment. (*Id.* ¶ 170(5).) In a third, the complaint describes the defendants' failure to provide a build-in modem with a shipment, even though the plaintiff had requested it; it alleges that the defendants tried to "shift the blame" for the mistake onto plaintiff. (*Id.* ¶ 170(4).) These claims are nothing more than accusations that defendants did not live up to the terms of the deal they struck with B&M.

The Court need not decide whether B&M's remaining allegations are collateral to its breach-of-contract claims, because they are all deficiently pled. Not only must a complaint plead fraud or misrepresentation that is independent of a breach of contract; it must also plead fraud "with particularity," Fed. R. Civ. P. 9(b), which means a plaintiff must "(1) detail the statements

7

(or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004); *see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, No. 91-2923, 1994 WL 88129, at *7 (S.D.N.Y. Mar. 15, 1994) ("Sweeping references to the collective fraudulent actions of multiple defendants will not satisfy the particularity requirements of Rule 9(b)"). A fraud claim should also plead scienter, and although it may do so generally, *see* Rule 9(b), the plaintiff must still allege "facts that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994); *see PI, Inc. v. Quality Prods., Inc.*, 907 F. Supp. 752, 763 (S.D.N.Y. 1995) ("[m]ere nonperformance . . . does not give rise to an inference of fraudulent intent unless a defendant violated an agreement so maliciously and so soon after it is made that his desire to do so before he entered into the agreement is evident" (quotation marks and citation omitted)).

All of B&M's allegations fail this heightened pleading standard. The complaint leans heavily on email correspondence between the parties attached as exhibits to the complaint. Those emails, however, do not support the inference that defendants defrauded B&M; they only reflect negotiations between the parties about when and how to resolve various problems, and in some places disagreements about what the parties had promised each other. *See Shields*, 25 F.3d at 1129.

Other allegations are similarly deficient. Defendant Dreher allegedly promised B&M that he "personally would be responsible for your account, and that we would 'make things right' if they were ever wrong" (Compl. Ex. C), but failure to fulfill that promise does not by itself suggest fraud. Nor does any inference of fraudulent intent arise merely because "copies of all

8

service reports by Defendants' personnel and their subcontracts, as well as copies of communications pertaining to installation and service at the new plant . . . were always promised to be send [sic] but were not." (Compl. ¶ 191(1).) Moreover, that "Defendants made certain representations with respect to the manner in which they would handle their operations" (*id.* ¶ 85) is too vague to satisfy Rule 9: it does not identify what specific representations were made or at what time, and it does not say why these representations turned out to be fraudulent, just that they turned out to be wrong. The same goes for defendants' alleged failure to "to timely disclose and provide B&M with accurate, timely and complete information respecting possible flaws and defects in their design, testing, manufacture and production of equipments and parts." (*Id.* ¶¶ 86–89.) And when defendants allegedly promised "top of the line" equipment with "topnotch output fit for a 5 star customers [sic]," they were making a "statement of opinion" or "commercial puffery," which is not actionable in New York. *See Siegel v. Bader*, 657 N.Y.S.2d 28, 28 (N.Y. App. Div. 1997); *Hamlet on Olde Oyster Bay Home Owners Ass'n, Inc. v. Holiday Org'n, Inc.*, No. 11647-04, 2006 WL 1982603, at *7–*8 (July 7, 2006) (assurances of "first class service," "finest materials," "incomparable value and enduring quality," and "Northeast's first 5 star Resort community" were non-actionable puffery).

The allegation that comes closest to satisfying Rule 9(b)'s pleading threshold is that, prior to B&M's purchase of equipment for its new plant in 2005, defendant Dreher promised B&M that "Kannegiesser equipment is . . . designed and produced for at least 6 hours of smooth high volume (not less than 700 sheets average per hour) operation." (*Id.* ¶ 170(3).)[2] This allegation is

---

[2] Paragraph 170(3)'s allegations, in their uncorrected entirety, are:

> As early as October 1, 2004 and all the way up to May 25, 2006, and even till late 2008, Mr. D[reher] has maintained in his communications with Boris and Miron Markus, so as to induce them to make million dollar purchases, that Kannegiesser equipment is top of the line, designed and produced for at least 6 hours of smooth high volume (not less then 700 sheets average per hour) operation with top notch output fit for a 5 star customers as would be rated by AAA Mobile hotel rating. But in May 24, 2006 e-mail to Boris

9

specific and particularized, and it raises the possibility that defendants made factual representations about the nature and capabilities of their equipment that were deliberately false and calculated to induce the plaintiff to enter into a purchasing agreement. *See Kaddo v. King Serv. Inc.*, 673 N.Y.S.2d 235, 237 (N.Y. App. Div. 1998) (upholding a verdict for fraud based on evidence that plaintiff bought a gas station in reliance on the seller's misrepresentations regarding the condition of the station's gas tanks); *AT&T Sys., Inc. v. McLean Bus. Servs., Inc.*, 572 N.Y.S.2d 582, 583 (N.Y. App. Div. 1991) (affirming viability of fraud claim based on "alleged misrepresentations concern[ing] the inherent capacities and characteristics of the [product plaintiff subsequently leased from defendant]"). But the complaint also acknowledges that the representation "was apparently meant by [Dreher], (although never qualified prior to the May 24, 2006 e-mail) to be produced at laboratory created optimal settings, not at Plaintiff's new plant." (Compl. ¶ 170(3).) If anything, this creates an inference that fraudulent intent is *lacking*.

That inference—that Dreher lacked fraudulent intent—is only strengthened upon examination of the May 24, 2006 email cited in the complaint. The e-mail, sent by Boris Markus to Dreher, contains what is essentially a running dialogue between the two: it excerpts Markus's and Dreher's statements to each other in previous emails, then responds to them. (Compl. Ex. O.) The exchange relevant to B&M's fraudulent inducement claim is, in its uncorrected form:

---

> Markus, even that representation turned out to be not as made. The promised exceptional quality and high volume of hassle free top notch output as only Kannegiesser equipment was designed to produce consistently, according to Mr. D, was apparently meant by him, (although never qualified prior to the May 24, 2006 e-mail) to be produced at laboratory created optimal settings, not at Plaintiff's new plant.

(Compl. ¶ 170(3).) Much of this paragraph, of course, is inactionable puffery. *See Rombach v. Chang*, 355 F.3d 164, 175 (2d Cir. 2004) ("'puffery' or 'misguided optimism' is not actionable as fraud").

10

>[Markus:] Successful [equipment] will be judge as ability to produce for a period of no less then 6 hours without issues created by the equipment with a production rate of no less then 700 sheets average per hour deliverable to a 5 star customers as would be rated by AAA Mobile hotel rating service as this is what was guaranteed to me by you and Mr. Harre on or around October 1st 2004 in Vlotho.
>
> *[Dreher] I recall our conversation and the theoretical production numbers as well as projected actual productivity for the EMT. We all agreed that many factors influence the performance of a feeder (presentation to the operator, operator efficiency, mix of goods, sheet size, ironer speed, availability, moisture retention, stain tear, etc.). Your above criteria are achievable only at 140+ fpm under optimum conditions.*
>
> [Markus:] Taking only over size king size sheets of 130" long with no overlap going into the ironer at 140fpm at optimum the ironer should produce 775+ sheets per hour. My statement of 700+ sheets per hour which is very much industry standard given my above calculation this gives us nearly 11% room for errors and problems further more being that the calculation is based on only oversized sheets and on only king size sheets I believe that the margin for errors and problems is nearly 20% as I did state 700+ sheets average per hour. Also industry standard takes into account all ironers old and new and we purchased "high performance" ironers they should always exceed industry standard.

(*Id.* (emphasis in original).) While not a model of clarity, this email exchange does not give the Court reason to draw a strong inference of fraudulent intent. Dreher suggests that he never promised specific production numbers for B&M's plant, and Markus does not seem to dispute this fact—only that the equipment should "exceed industry standard" and does not. Without any particularized allegation that gives rise to a strong inference of fraudulent intent, plaintiff's eighth and fourteenth causes of action must be dismissed.

## IV. Negligent Misrepresentation Claim

Negligent misrepresentation under New York law occurs when:

> (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

11

*Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000). "A negligent representation must be made for the very purpose of inducing action, and the action may not be merely an indirect or collateral consequence thereof." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 583 (2d Cir. 2005) (internal quotation marks and citation omitted). Just as with intentional misrepresentation, negligent misrepresentation must be pled with particularity. Fed. R. Civ. P. 9(b); *see Aetna*, 404 F.3d at 583.

A claim for negligent misrepresentation can succeed only where the plaintiff's reliance on the misrepresentation was justified. To determine that question, courts should assess (1) "whether the person making the representation held or appeared to hold unique or special expertise"; (2) "whether a special relationship of trust or confidence existed between the parties"; and (3) "whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263–64 (N.Y. 1996); *see Sogeti USA LLC v. Whirlwind Bldg. Sys., Inc.*, 06-3775, 2008 WL 1859887, at *3 (2d Cir. Apr. 24, 2008). B&M pleads the existence of a special relationship with the defendants, but it does so conclusorily and without any factual support. Its chief support for a special relationship is that defendants understood the importance of their equipment to B&M's business. But this, without more, does not suggest the existence of a special relationship. The facts as stated in the complaint reveal nothing more than typical arm's-length transactions between the parties.

A "sparsely pled special relationship of trust or confidence is not fatal to a claim for negligent misrepresentation where the complaint emphatically alleges the other two factors enunciated in *Kimmell*." *Eternity Global*, 375 F.3d at 188 (internal quotation marks omitted). Nevertheless, in *Eternity Global*, the Second Circuit affirmed a district court's dismissal of negligent misrepresentation claims on the ground that reasonable reliance was not adequately

12

pled. It emphasized that this was not a case where the plaintiff was "wholly without knowledge" and wanted assurances from a defendant "with exclusive knowledge." *Id.* at 189. Here, too, B&M has failed to allege that defendants possessed unique or special expertise. The case might be different had B&M pled facts indicating both its own lack of experience and knowledge about laundering equipment as well as defendants' breadth of experience and knowledge. This B&M has not done. Instead, the complaint suggests that B&M had extensive experience in the laundering business and chose to purchase equipment from the defendants only after a deliberate and extensive selection process. B&M has been in the laundering business since 1992—almost ten years before its first contact with the defendants—and, before entering into a purchase agreement with the defendants, it sent employees to Germany to assess the defendants' and another company's manufacturing processes. Given the complaint's failure to plead facts that would make reliance reasonable, and its affirmative allegations that reflect B&M's knowledge and experience, the plaintiff's fifteenth claim must be dismissed.

## V. Interference Claim

Defendants have also moved to dismiss B&M's claim for "intentional interference with the performance of obligation and inducement in the breach thereof by all defendants." As the defendants note, the complaint does not say exactly what cause of action it intends to invoke: this might be a claim for tortious interference with contract, or for tortious interference with prospective economic advantage. But the difference is of no consequence; B&M has failed to plead facts sufficient to maintain either cause of action.

A properly pled complaint for tortious interference with contract under New York law must allege: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-

party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (internal quotation marks and citation omitted). A properly pled complaint for tortious interference with prospective economic advantage requires something similar: "(1) [plaintiff] had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Id.* at 400.

Under either theory, a complaint must allege that the defendant *intended* to interfere with the plaintiff's business or contractual relations with another party. *See Four Finger Art Factory, Inc. v. Dinicola*, No. 99-cv-1259, 2000 WL 145466, at *6–*7 (S.D.N.Y. Feb. 9, 2000) (dismissing tortious interference claims for not specifying how defendant actually interfered); *Envirosource, Inc. v. Horsehead Res. Dev. Co., Inc.*, No. 95 Civ. 5106, 1996 WL 363091, at *14 (S.D.N.Y. July 1, 1996) (dismissing tortious interference claim for "[f]ailing to identify a specific contract or business relationship allegedly interfered with"). The defendant's interference must be direct: "the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff." *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477, 482 (S.D.N.Y. 1997).

In *Black Radio Network, Inc. v. NYNEX Corp.*, No. 96-4138, 2000 WL 64874, at *4 (S.D.N.Y. Jan. 25, 2000), the court dismissed a claim for tortious interference with prospective economic advantage because the complaint at best "merely asserts that plaintiff lost customers due to [defendant's] inadequate and untested equipment." The same is true here. B&M has not even tried to allege that the defendants intended to disrupt its business relationships with

14

hoteliers—much less offered any factual support for such a contention. On account of these pleading deficiencies, B&M's tenth cause of action is hereby dismissed.

## VI. Attorneys' Fees

Defendants have moved to dismiss B&M's freestanding cause of action for attorneys' fees. Under New York law, "the general rule is that each litigant is required to absorb the cost of his own attorney's fees . . . in the absence of a contractual or statutory liability." *Umfrey v. Ne Moyer*, 584 N.Y.S.2d 702, 703 (N.Y. App. Div. 1992) (internal quotation marks and citation omitted). No such contractual or statutory authority for shifting fees is alleged here beyond the complaint's vague allegation of "the wrongful and illegal conduct of Defendants" (Compl. ¶ 196). To be sure, the Court has inherent power to award attorneys' fees when "the interests of justice so require"—as, for example, when a successful party's opponent "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Hall v. Cole*, 412 U.S. 1, 4–5 (1973). But this power does not depend on the plaintiff's bringing a cause of action for fees. Plaintiff's sixteenth claim is dismissed, but should B&M be successful in this litigation and in good faith believe that an award of attorneys' fees is appropriate, it may of course move for fees at that time.

## VII. Claims Against Dreher

Defendants have moved to dismiss all of the claims brought against defendant Dreher. B&M alleges that Dreher breached contracts (claim one) and implied warranties (claim twelve); that he breached a fiduciary duty (claim four); that he committed fraud (claim fourteen), intentional misrepresentation (claim eight), and negligent misrepresentation (claim fifteen); that he owes restitution and reimbursement (claim five); that he committed negligence or gross negligence (claim nine); and that he tortiously interfered with B&M's business or contractual

relations (claim ten). This Court has already found that B&M's fourth, eighth, tenth, fourteenth, and fifteenth claims should be dismissed against all defendants. The remaining claims against Dreher—the first, fifth, ninth, and twelfth—are discussed below.

A.     **Breach of Contract, Breach of Implied Warranty, and Restitution**

The plaintiff's first and twelfth claims are that Dreher, among others, breached a contract with and an implied warranty to B&M. Its fifth claim, for restitution and reimbursement, is another version of its breach-of-contract claim. Plaintiffs may plead restitution as an alternative to breach of contract, on the theory that even if no express contract controls, the defendant would be unjustly enriched without a restitution award to the plaintiff. *See Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 663 (2d Cir. 1996).

A corporate officer acting in his official capacity is not personally liable for the corporation's breach of a contract. *Value Time, Inc. v. Windsor Toys, Inc.*, 709 F. Supp. 436, 438 (S.D.N.Y. 1989) (holding that a corporate officer could not be held liable for the corporation's alleged breach of contract where he was acting in his official capacity as an officer); *Maranga v. McDonald & T. Corp.*, 777 N.Y.S.2d 732, 733 (N.Y. App. Div. 2004) ("Where a principal of a corporation expressly signs a contract in his or her capacity as an officer of the corporation, unless he or she purports to personally bind him or herself, he or she will not be held personally liable under the contract."). The same is true where a corporation is found liable for restitution. *See Isenberg v. H. Cotler Co., Inc.*, No. 94-7432, 1996 WL 131874, at *2 (S.D.N.Y. Mar. 21, 1996) (treating as one issue the questions of personal liability for restitution and for breach of contract). Moreover, an officer is generally not liable for *inducing* a breach of contract between the corporation and another party. *See Murtha v. Yonkers Child Care Assoc., Inc.*, 45 N.Y.2d 913, 915 (N.Y. 1978) (corporate officer not liable in tort for inducing breach of employment

contract). An exception to that rule exists where a corporate officer commits "independent torts or predatory acts directed at another." *Id.*

B&M does not claim that Dreher ever acted other than in his official capacity as a corporate officer. The complaint describes Dreher as the K-USA employee with the most personal involvement in and responsibility for his company's relationship with B&M, but that only underscores the fact that his actions were on behalf of K-USA, not in some other role. Dreher did allegedly promise to "personally . . . be responsible for [B&M's] account" and to "make things right" (Compl. Ex. C), but he did so in his capacity as a K-USA representative.

To the extent the complaint intends to allege otherwise—i.e., that Dreher breached a contract that he entered into with B&M of his own accord—it fails to plead the necessary facts. To maintain a claim for breach of contract, plaintiff must plead: "(1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *RIJ Pharm. Corp. v. Ivax Pharms., Inc.*, 322 F. Supp. 2d 406, 412 (S.D.N.Y. 2004). In *Isenberg v. H. Cotler Co., Inc.*, for example, the plaintiff sued a corporate officer for breach of contract and restitution. Because he alleged that the corporate officer entered into an oral contract that was separate from the written contract entered into with the corporation and supported by additional consideration, the court denied the officer's motion to dismiss. 1996 WL 131874, at *2. No such facts are pled here.

Accordingly, B&M's first, fifth, and twelfth causes of action are dismissed as against Dreher.

### B. Negligence or Gross Negligence

The plaintiff's ninth cause of action alleges negligence or gross negligence against Dreher, among others. Defendants offer no specific reason why this claim should be dismissed,

and in their papers they seemingly assume that only an officer's "independent tort" can give rise to personal liability. An independent tort does give rise to personal liability, *Ackerman v. Vertical Club Corp.*, 462 N.Y.S.2d 657, 660 (N.Y. App. Div. 1983), but so does an officer's "participat[ion] in the commission of a tort by the corporation," *Clark v. Pine Hill Homes, Inc.*, 492 N.Y.S.2d 253, 253 (N.Y. App. Div. 1985). Presumably B&M relies chiefly on this second ground for personal liability—that Dreher participated in K-USA's negligence. Dreher, for example, allegedly ignored repeated notifications by the plaintiff about malfunctioning equipment (Compl. ¶ 33); failed to accurately diagnose problems with equipment and parts (*id.* ¶ 111); and delayed in sending service personnel to B&M's plant to repair faulty equipment (*id.*). Defendants have not shown why these allegations, if true, could not plausibly entitle B&M to relief for Dreher's negligence.

Still, the Court is skeptical that B&M's negligence claims are anything more than a "reiteration" of its breach of contract claims.[3] *In re September 11 Litig.*, 640 F. Supp. 2d 323, 339 (S.D.N.Y. 2009). A "tort claim will not lie as a means to enforce a contractual bargain," *id.* at 337, and tort and contract claims can coexist in only limited circumstances, *id.* at 339. First, a tort claim may survive if it stems from a duty separate from a defendant's contractual duty to perform. *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996). Second, a tort claim may survive if it is "collateral and extraneous" to the contract provision breached. *Id.* Third, a tort claim may survive if it would yield "special damages" not recoverable under the contract. *Id.* Plaintiff's complaint satisfies none of these requirements. Instead, as in *In re September 11 Litigation*, B&M's negligence and contract claims "plead the same acts . . . and seek essentially the same relief." *In re September 11 Litig.*, 640 F. Supp. 2d at

---

[3] Because defendants have only moved to dismiss the negligence claim against Dreher, the Court does not address plaintiff's claims for negligence against the other defendants.

339. Plaintiff's first claim, for "breach of purchase agreements," alleges that the breaches include

> [f]ailures to properly design, test, manufacture and produce each piece of the equipment per exact specifications within the agreements . . . [and] Defendants' failure to timely address an overwhelming number of problems with the equipment as specified in the PAs in spite of B&M's continuous and relentless attempts to bring such problems to Defendants' attention for resolution.

(Compl. ¶ 42.) Plaintiff's negligence allegations are remarkably similar:

> Defendants . . . failed to meet the standard of ordinary care, by *inter alia*, failing to properly design, manufacture, as well as timely and properly test, a service, maintain, repair, replace their equipment and parts, as results of which equipment malfunctioned, parts failed, causing equipment and additional parts to be further damaged.

(*Id.* ¶ 104.) This negligence claim is nothing more than a duplication of B&M's core contract claims. Accordingly, plaintiff's ninth cause of action is dismissed as against Dreher.

## CONCLUSION

For the reasons given, the defendants' partial motion to dismiss [10] is granted. Plaintiff's fourth, eighth, tenth, fourteenth, fifteenth, and sixteenth claims are all dismissed in their entirety. Plaintiff's first, fifth, ninth, and twelfth claims are dismissed as to Dreher.

SO ORDERED.

Dated: New York, New York
January 19, 2010

Richard J. Holwell
United States District Judge